**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN and PIPKIN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

September 19, 2023

# In the Court of Appeals of Georgia

A23A1077. CRAW v. THE STATE.

DILLARD, Presiding Judge.

Following trial, a jury convicted Darnell Craw on charges of voluntary manslaughter (as a lesser-included offense of felony murder), aggravated assault, and possession of a firearm during the commission of a felony. Craw appeals the jury verdict and denial of his motion for new trial, challenging the sufficiency of the evidence supporting his voluntary manslaughter and aggravated-assault convictions. Specifically, he argues the trial court erred by instructing the jury on voluntary manslaughter; refusing to instruct the jury on involuntary manslaughter; inadequately instructing the jury on his defense of transferred justification; and providing confusing instructions on justification and mutual combat. For the following reasons, we affirm.

Viewed in the light most favorable to the jury's verdict,[1] the record shows that the Shakespearean-like tragedy giving rise to this case involves numerous residents of the Wellborn Creek neighborhood in Lithonia, Georgia, as well as a slew of family members and friends. The number of people involved, the shifting scenery, and disjointed timeline forming the factual backdrop of this appeal make the retelling of this incident challenging; but this context is crucial to understanding the important issues being addressed in this opinion.

This unfortunate story begins with family members and friends living together in relative harmony. In 2015, Craw resided with his sister and her boyfriend, Antwan Boswell, at his sister's home—located at 5687 Wellborn Creek Drive. Approximately one year earlier (and before Craw moved in), Selenia Soto—a friend of Craw's sister—also lived in the home; and as a result, Soto's boyfriend and eventual husband—Kasey McClure—spent a considerable amount of time there. Initially, Boswell and McClure were friends; but at a party around Halloween in 2014, everything changed. The two men had a heated argument, which allegedly escalated into Boswell sucker punching McClure. And following this altercation, Soto moved out of the home and went to live with McClure. At first, the two stayed for a short

---

[1] *See, e.g.*, *Libri v. State*, 346 Ga. App. 420, 421 (816 SE2d 417) (2018).

period of time with McClure's uncle, who lived just one street away. But later, McClure and Soto moved to Gainesville, Georgia, where they lived with McClure's mother. The couple remained in Gainesville for nearly a year before moving back to the Lithonia area, where they stayed with various friends—including a friend of McClure's, who also happened to live on Wellborn Creek Drive a few houses down the street from Boswell and Craw's sister. So, the former friends—Boswell and McClure—were now back in close proximity to one another.

On the afternoon of October 12, 2015, Boswell and his friend, Glenn Guise (who also lived on Wellborn Creek Drive), drove to a nearby gas station and convenience store. And upon their arrival, they encountered McClure exiting the store after purchasing some items for Soto, who was waiting in the couple's car. Still angry about being sucker punched the previous year, McClure challenged Boswell to a fight. Boswell agreed, and the two men began to engage in fisticuffs. At first, Guise remained a spectator; but moments later, several of McClure's friends—who happened to be driving by and witnessed the scuffle—pulled into the gas station parking lot and joined the melee, striking both Boswell *and* Guise. And because the situation had now escalated in a manner he had not intended, McClure drew a

handgun from his pocket and fired two shots into the air, causing the fight to stop and the parties to disburse.

Immediately after this incident, Boswell and Guise returned to Craw's sister's house (at 5687 Wellborn Creek Drive) and informed Craw, his sister, and several other friends as to what transpired at the gas station. Meanwhile, McClure and Soto drove to McClure's uncle's house, hoping they could use his Wi-Fi to make a phone call (because Soto's smart phone only worked when connected to a network). Then, after determining McClure's uncle was not home, they decided to go to McClure's friend's house—who also happened to live on Wellborn Creek Drive—to use his Wi-Fi. Upon arriving in the neighborhood, they saw Boswell, Guise, Craw, and others outside in front of Craw's sister's home. McClure (who was driving) stopped in front of his friend's house—just past Craw's sister's house—to see if Soto could get a Wi-Fi signal. But worried that the crowd of people in front of Craw's sister's house were now behind him, McClure pulled forward and turned around in a nearby cul-de-sac, so that his car was now facing the entrance to the neighborhood.

As McClure parked, Guise approached his car and angrily asked why his friends jumped him at the gas station. But as McClure tried to explain that he had not called his friends, he and Soto noticed Craw was holding a handgun. And fearing yet

another violent confrontation, McClure immediately reversed his car a few blocks back up the street and parked in front of a different friend's house, so that he and Soto could plot their next moves.

After several minutes, McClure decided he would lie down in the backseat of the vehicle while Soto drove out of the neighborhood—hoping the crowd in front of Craw's sister's house would think he had been dropped off and let the car pass. Soto then began driving back down the street; and as they approached the crowd, McClure told her to speed up. But just as they were about to pass the house (with Boswell and Guise still standing near the street), they saw Craw on the porch stairs point his handgun at them and begin firing. McClure returned fire, shooting out the car's back window in process, as Soto sped away.

After the shooting stopped, and McClure and Soto had fled, Craw and Boswell saw Guise lying on the ground with a bullet wound in his back. Boswell helped lift Guise into another friend's vehicle, who then quickly drove him to the hospital. But tragically, Guise died from his wound.

A subsequent autopsy recovered a .380 caliber bullet from Guise's body. And police officers—responding to 911 calls from neighbors (not from any of the participants in or onlookers to the incident)—found .380 and .40 caliber shell casings

5

at the scene. Later that same afternoon, a police officer interviewed Boswell and Craw's sister about the events leading up to the shooting, which then resulted in an arrest warrant being issued for McClure and Soto.

Shortly after the warrant issued, McClure and Soto turned themselves in to law enforcement. Initially, Boswell, Craw and his sister, and Guise's family assumed McClure shot Guise. But two days after the shooting, one of Craw's friends gave Guise's family DVR footage from security cameras on Craw's sister's home, which the family then turned over to law enforcement. And after reviewing the footage, law enforcement determined Craw fired the shot that struck and tragically killed Guise. As a result, an arrest warrant was then obtained for Craw, and he was arrested in New York several weeks later.

Thereafter, the State charged Craw, via indictment, with one count each of felony murder, aggravated assault, and possession of a firearm during the commission of a felony. The case then proceeded to trial, during which the State presented the foregoing evidence. Additionally, the State submitted the DVR of the footage from the security cameras on Craw's sister's house and played it for the jury. The video begins about ten minutes before the shooting and initially shows Boswell, Guise, and Guise's brother in an animated conversation on the street in front of the house. A few

6

minutes later, Craw appears and joins the conversation. Later, Craw leaves (apparently going back inside the house) and then returns after a few minutes, now wearing latex gloves. And moments later, McClure and Soto's vehicle speeds by, and Craw fires his handgun toward the car as others attempt to take cover. Once the shooting stops, Guise is shown lying on the ground, at which point Boswell and Guise's brother lift him into a vehicle that drives away. And finally, prior to law enforcement's arrival, the footage shows Craw searching the area and picking up shell casings.

Craw testified in his own defense, claiming McClure had recently thrown a bottle at him and threatened to "shoot up" his house. In light of those actions, after Boswell and Guise recounted the details of the fight at the gas station, Craw decided to arm himself with his sister's .380 caliber handgun upon learning McClure and Soto had driven into the neighborhood. Craw then observed Boswell and Guise talking to McClure, but thought the vehicle's sudden reversal up the street indicated tensions had not eased. Craw further testified that, as he stood on the porch steps, McClure and Soto sped by in McClure's vehicle, and McClure—who was now in the backseat—began firing his handgun at him. And while he acknowledged returning fire, Craw did not believe he shot Guise until viewing the security footage some time

later. Finally, Craw testified that he left Georgia, going first to Alabama and then ultimately to New York, because he was afraid Guise's family was angry with him.

At the conclusion of the trial, the jury found Craw not guilty of felony murder but guilty of voluntary manslaughter as a lesser-included offense of felony murder, aggravated assault, and possession of a firearm during the commission of a felony. Craw then obtained new counsel and filed a motion for new trial, which he twice amended. The trial court held a hearing on Craw's motion for new trial but ultimately denied it. This appeal follows.

1. Craw first contends the evidence was insufficient to support his convictions of voluntary manslaughter and aggravated assault, arguing that firing his handgun at McClure was justified as an act of self defense that inadvertently resulted in Guise's death. We disagree.

When a criminal conviction is appealed, the evidence must be viewed in the light most favorable to the verdict, and the appellant no longer enjoys a presumption of innocence.[2] And in evaluating the sufficiency of the evidence, we do not "weigh the evidence or determine witness credibility, but only determine whether a rational

---

[2] *See English v. State*, 301 Ga. App. 842, 842 (689 SE2d 130) (2010) (noting that following conviction, an appellant no longer enjoys a presumption of innocence).

trier of fact could have found the defendant guilty of the charged offenses beyond a reasonable doubt."[3] The jury's verdict will be upheld, then, so long as there is "some competent evidence, even though contradicted, to support each fact necessary to make out the State's case."[4] Bearing these guiding principles in mind, we turn to Craw's specific challenge to the sufficiency of the evidence supporting his voluntary manslaughter and aggravated-assault convictions.

Under OCGA § 16-5-2 (a), a person commits the offense of voluntary manslaughter when "he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person . . . ."[5] Specifically, evidence of voluntary

---

[3] *Jones v. State*, 318 Ga. App. 26, 29 (1) (733 SE2d 72) (2012) (punctuation omitted); *see Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (noting that the relevant question is, after viewing the evidence in the light most favorable to the prosecution, could any rational jury found the essential elements of the crime beyond a reasonable doubt).

[4] *Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001) (punctuation omitted).

[5] Although the State charged Craw with felony murder, it is well established that voluntary manslaughter can be a lesser-included offense of felony murder. *See Blackwell v. State*, 259 Ga. 810, 810 (1) (388 SE2d 515) (1990) (explaining that "voluntary manslaughter is a lesser included offense of felony murder, as we read

manslaughter "may be found in a situation which arouses the sudden passion in the person killing so that, rather than defending himself, he wilfully kills the attacker, albeit without malice aforethought, when it was not necessary for him to do so in order to protect himself."[6] And if, upon a sudden altercation, the parties agree to fight and one of them is killed, "such killing is voluntary manslaughter, no matter who strikes the first blow."[7] Importantly, a mutual intention to fight "need not be proved directly, but may be inferred by the jury from the conduct of the parties."[8] Indeed, if there is any evidence both parties "were armed and intended to resolve their

[OCGA § 16-5-1, defining murder] and [OCGA § 16-1-6, defining lesser-included offenses], because an act done in passion involves a less culpable mental state than the state of real or imputed malice which is the foundation of the felony murder rule" (punctuation omitted)); *Malone v. State*, 238 Ga. 251, 251-52 (232 SE2d 907) (1977) (same).

[6] *White v. State*, 312 Ga. App. 421, 424 (1) (b) (718 SE2d 335) (2011) (punctuation omitted); *accord Hamlette v. State*, 353 Ga. App. 640, 648 (4) (839 SE2d 161) (2020).

[7] *Platt v. State*, 335 Ga. App. 49, 53 (1) (a) (778 SE2d 416) (2015) (punctuation omitted); *accord White v. State*, 179 Ga. App. 276, 277 (1) (346 SE2d 91) (1986); *see Moore v. State*, 307 Ga. 290, 295-96 (4) (835 SE2d 610) (2019) (noting that "[m]utual combat occurs when there is combat between two persons as a result of a sudden quarrel or such circumstances as indicate a purpose, willingness, and intent on the part of both to engage mutually in a fight" (punctuation omitted)).

[8] *Platt*, 335 Ga. App. at 53 (1) (a) (punctuation omitted); *accord White*, 179 Ga. App. at 277 (1).

differences by fighting each other with deadly weapons, a defendant can be convicted of voluntary manslaughter in lieu of murder."[9] Additionally, under OCGA § 16-5-21 (a) (2), a person commits the offense of aggravated assault when "he or she assaults . . . [w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury[.]" And intentionally firing a gun at another, absent justification, "may be sufficient in and of itself to support a conviction of aggravated assault."[10]

Here, Craw claimed McClure recently threatened to "shoot up" the house where he resided and that he was aware of the fight at the gas station on the day of the incident, which involved an armed McClure, his friends, Boswell, and Guise. The evidence shows that, as a result, Craw armed himself with a handgun and was outside when McClure and Soto drove into the neighborhood and Guise angrily confronted them about the earlier incident. Additionally, the evidence shows Craw stood on his front porch steps, and as Soto and McClure's vehicle sped by, he pointed his handgun toward the vehicle and fired several shots, one of which struck and killed Guise. And

---

[9] *Platt*, 335 Ga. App. at 53 (1) (a) (punctuation omitted).

[10] *Hayes v. State*, 298 Ga. 339, 343 (b) (781 SE2d 777) (2016) (punctuation omitted); *accord Hamlette*, 353 Ga. App. at 648-49 (4).

11

while it is undisputed Guise was not Craw's intended target, under the legal theory of transferred intent, "if a person shoots at another under circumstances that if death had ensued the offense would be reduced from murder to voluntary manslaughter, and by accident the shot hits and kills another person standing by, for whom the shot was not intended, the offense would be voluntary manslaughter."[11]

This evidence notwithstanding, Craw claims it is insufficient because his act of firing a handgun at McClure was justified as an act of self defense. And to be sure, OCGA § 16-3-21 (a) provides:

> [a] person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force; however, except as provided in Code Section 16-3-23, a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent

---

[11] *Carter v. State*, 331 Ga. App. 212, 219 (3) (770 SE2d 295) (2015) (punctuation omitted); *see Happoldt v. State*, 267 Ga. 126, 127 (1) (b) (475 SE2d 627) (1996) (holding that "[u]nder the doctrine of transferred intent, when an unintended victim is struck down as a result of an unlawful act actually directed against someone else, the law prevents the actor from taking advantage of his own wrong and transfers the original intent from the one against whom it was directed to the one who actually suffered from it" (punctuation omitted)).

death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

Nevertheless, questions about the existence of justification are for the jury to resolve, and the jury "may reject any evidence in support of a justification defense and accept evidence that a shooting was not done in self-defense."[12] Given these circumstances, the evidence presented during the trial was sufficient to support the jury's guilty

[12] *Gibbs v. State*, 309 Ga. 562, 564 (847 SE2d 156) (2020) (punctuation omitted); *accord Goodson v. State*, 305 Ga. 246, 248 (1) (b) (824 SE2d 371) (2019).

verdict on the offenses of voluntary manslaughter[13] and aggravated assault.[14]

Accordingly, Craw's enumeration of error in this regard lacks merit.[15]

---

[13] *See Hutto v. State*, 320 Ga. App. 235, 237 (1) (739 SE2d 722) (2013) (holding defendant and victim's history of conflict leading up to the incident, together with victim's final conduct in engaging defendant in a fight was sufficient provocation to excite the passion necessary for conviction of voluntary manslaughter); *Coker v. State*, 209 Ga. App. 142, 143 (433 SE2d 637) (1993) (concluding that, even though shot fired by someone other than defendant strayed and killed a bystander, evidence was sufficient to support conviction for voluntary manslaughter because defendant stood his ground to engage in mutual combat rather than attempting to withdraw peaceably or act solely in self-defense); *Jordan v. State*, 164 Ga. App. 141, 141 (1) (296 SE2d 430) (1982) (finding evidence was sufficient to enable a rational trier of fact to conclude defendant was guilty of voluntary manslaughter in that he fatally stabbed the victim with a knife during an altercation in which he intended to stab someone else).

[14] *See Happoldt*, 267 Ga. at 127 (1) (b) (holding evidence defendant shot into automobile intending to kill his ex-wife and that one of bullets struck his son supported conviction for aggravated assault on his son under doctrine of transferred intent and State was not required to prove that defendant intended to shoot his son); *Robertson v. State*, 245 Ga. App. 649, 650 (1) (538 SE2d 755) (2000) (concluding that, although there was no evidence defendant intended to injure his mother or the children when he fired gun (intending instead to shoot his wife), evidence supported aggravated-assault conviction based on subsection under the doctrine of transferred intent).

[15] Craw does not challenge the indictment in either of his enumerations of error. Nevertheless, in his appellate brief, he seems to argue the indictment should have more explicitly alleged that McClure was the intended victim and Guise was the victim only as a result of transferred intent. But any challenge to the sufficiency of the form of the indictment (explicit or implicit), along with all of the arguments relying on it, has been waived because it should have been raised as a special demurrer before trial. *See* OCGA § 17-7-113 ("All exceptions which go merely to the

14

2. Craw also maintains the trial court erred by instructing the jury on the lesser-included offense of voluntary manslaughter as a result of mutual combat. Again, we disagree.

As our Supreme Court has explained, for a requested jury instruction to be warranted, it must be "legal, apt, and precisely adjusted to some principle involved in the case."[16] And to authorize a jury instruction on a subject, there need only be produced at trial "slight evidence supporting the theory of the charge."[17] Specifically,

---

form of an indictment or accusation shall be made before trial."); OCGA § 17-7-110 ("All pretrial motions, including demurrers and special pleas, shall be filed within ten days after the date of arraignment, unless the time for filing is extended by the court."); *Miller v. State*, 305 Ga. 276, 279 (1) (b) n.2 (824 SE2d 342) (2019) (explaining that all pretrial motions, including special demurrers, must be filed within 10 days after arraignment and failure to do so results in waiver). Moreover, as Craw even acknowledges in his brief, the indictment here was sufficient, as it could hardly be characterized as failing to "allege the underlying facts with enough detail to sufficiently apprise the defendant of what he must be prepared to meet." *Bullard v. State*, 307 Ga. 482, 487 (2) (837 SE2d 348) (2019) (punctuation omitted).

[16] *Harrison v. State*, 310 Ga. 862, 866 (2) (855 SE2d 546) (2021) (punctuation omitted); *accord Barron v. State*, 297 Ga. 706, 708 (2) (777 SE2d 435) (2015).

[17] *Jones v. State*, 287 Ga. 770, 771 (2) (700 SE2d 350) (2010) (punctuation omitted); *accord Durden v. State*, 327 Ga. App. 173, 179 (6) (755 SE2d 909) (2014); *Hughes v. State*, 323 Ga. App. 4, 7 (2) (746 SE2d 648) (2013).

15

jury charges "must be adjusted to the evidence in the case,"[18] and we review those charges *de novo*.[19]

In this case, during the charge conference, the State requested the trial court instruct the jury on voluntary manslaughter as a lesser-included offense of felony murder and particularly on the principle of mutual combat. And over Craw's objection, the trial court agreed. Craw now argues this instruction amounted to error. This contention is a nonstarter,

A charge on mutual combat is warranted only when "the combatants are armed with deadly weapons and mutually agree to fight."[20] But if there is any evidence from which the jury "could have found that both parties intended to resolve their differences by fighting each other with deadly weapons, there is no error in giving a

---

[18] *Millen v. State*, 267 Ga. App. 879, 881 (2) (a) (i) (600 SE2d 604) (2004); *see Nations v. State*, 345 Ga. App. 92, 100 (3) (812 SE2d 346) (2018) ("It is axiomatic that a jury charge must be adjusted to the evidence, apt, and a correct statement of the applicable law." (punctuation omitted)); *Reid v. State*, 341 Ga. App. 604, 613 (5) (a) (802 SE2d 42) (2017) (same).

[19] *See Hines v. State*, 350 Ga. App. 752, 759 (2) (830 SE2d 380) (2019) (punctuation omitted); *accord Matos-Bautista v. State*, 353 Ga. App. 773, 777 (1) (839 SE2d 260) (2020).

[20] *Sanders v. State*, 283 Ga. 372, 375 (2) (c) (659 SE2d 376) (2008) (punctuation omitted); *accord Nelms v. State*, 285 Ga. 718, 722-23 (4) (b) (681 SE2d 141) (2009); *Hudson v. State*, 280 Ga. 123 (2) (623 SE2d 497) (2005).

charge on mutual combat."[21] Here, the State presented evidence that Craw and McClure decided to resolve their differences by firing handguns at each other, and so the instruction on mutual combat was warranted.[22] And importantly, because the mutual-combat charge "authorizes a jury to find the defendant guilty of voluntary manslaughter in lieu of murder, it is a charge that benefits a defendant and, as such, a convicted defendant's complaint that it was improper to give the charge is without merit."[23] The trial court did not err, then, in charging the jury on voluntary manslaughter as a result of mutual combat.[24]

---

[21] *Sanders*, 283 Ga. at 375 (2) (c); *see Johnson v. State*, 350 Ga. App. 478, 484 (829 SE2d 652) (2019) (explaining if there is some evidence from which the jury could find that "both parties intended to resolve their differences by fighting each other with deadly weapons, then a charge on mutual combat is justified" (punctuation omitted)).

[22] *See supra* note 13 & accompanying text.

[23] *Sanders*, 283 Ga. at 375 (2) (c); *accord White v. State*, 297 Ga. 218, 219 (2) (773 SE2d 219) (2015).

[24] *See Sinkfield v. State*, 266 Ga. 726, 727 (2) (470 SE2d 649) (1996) (concluding the history of violent aggressive behavior between defendant and his victim and fact both men were armed at the time of the murder raised an inference of a mutual intention to fight, and therefore supported charge on mutual combat); *Carreker v. State*, 273 Ga. 371, 372 (2) (541 SE2d 364) (2001) (holding that because there was some evidence from which the jury could have found that both parties intended to resolve their differences by fighting each other with deadly weapons, the trial court did not err by giving a mutual-combat charge).

17

3. Craw further contends the trial court erred in refusing to instruct the jury on involuntary manslaughter as a result of accident or reckless conduct. This contention likewise lacks merit.

A person commits the offense of felony involuntary manslaughter "when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony."[25] And a person commits the offense of misdemeanor involuntary manslaughter when the person "causes the death of another human being without any intention to do so, by the commission of a lawful act in an unlawful manner likely to cause death or great bodily harm."[26] Nevertheless, a charge on involuntary manslaughter is not warranted "even if it is the sole defense if the evidence does not support the charge."[27]

Here, there is no evidence Craw's handgun discharged accidentally or that his actions in brandishing a handgun were merely reckless. Rather, while he did not intend to shoot Guise, his actions in pointing his handgun at McClure's vehicle and

---

[25] OCGA § 16-5-3 (a).

[26] OCGA § 16-5-3 (b).

[27] *Folson v. State*, 278 Ga. 690, 693 (4) (606 SE2d 262) (2004) (punctuation omitted); *accord Boyd v. State*, 286 Ga. 166, 169 (4) (686 SE2d 109) (2009).

18

firing it were—by his own admission—intentional. Indeed, a charge on involuntary manslaughter is not authorized when, as in this case, the defendant claims he was justified in firing his handgun in self-defense.[28] As a result, the trial court did not err in refusing to give a charge on involuntary manslaughter due to accident or reckless conduct.

4. Additionally, Craw argues the trial court erred by inadequately instructing the jury on his defense of transferred justification. Once again, we disagree.

Under the principle of transferred justification, the flip side of the transferred-intent coin, "no guilt attaches if an accused is justified in shooting to repel an assault, but misses and kills an innocent bystander."[29] In this matter, immediately after instructing the jury on the principle of transferred intent, the trial court further

---

[28] *See Paul v. State*, 274 Ga. 601, 603-04 (3) (a) (555 SE2d 716) (2001) (explaining that charge on involuntary manslaughter was not warranted because defendant claimed self defense and defendant is guilty of no crime if justified in killing; if not so justified, homicide not within "lawful act" predicate of OCGA § 16-5-3 (b) because jury has of necessity determined to act unlawful); *Bennett v. State*, 254 Ga. 162, 163-64 (2) (326 SE2d 438) (1985) (concluding involuntary-manslaughter charge was not warranted when defendant admitted he intentionally fired a gun in the direction of the victim); *Shipman v. State*, 288 Ga. App. 134, 136 (1) (653 SE2d 383) (2007) (holding involuntary-manslaughter instruction was not warranted in trial for murder in which defendant claimed that he shot victim in self-defense).

[29] *Crawford v. State*, 267 Ga. 543, 544 (2) (480 SE2d 573) (1997).

19

charged the jury on the principle of transferred justification by providing as follows: "If an accused is justified in shooting to defend oneself but misses and kills or injures an innocent bystander, then no guilt attaches."

Here, Craw argues the trial court's instruction in this regard was inadequate, asserting that its lengthy charge on transferred intent compared to its one-sentence charge on transferred justification unduly emphasized the former theory at the expense of the latter. But in addition to instructing the jury on transferred justification, the record also shows the trial court thoroughly instructed the jury on justification and self-defense, including instructions that the defendant would be justified in using force intended or likely to cause death or great bodily harm if he reasonably believed such force to be necessary to prevent death or great bodily injury to himself or a third person and that he would be justified even in killing another person in defense of himself or others. Consequently, considered as a whole, the trial court's charge "made clear to the jury that it should acquit [Craw] if it determined he was justified in firing his weapon, regardless of whom the bullet struck."[30] The trial

[30] *Allen v. State*, 290 Ga. 743, 746 (3) (723 SE2d 684) (2012); *see id.* (holding that even though trial court failed to charge jury on transferred justification, its lengthy charge on justification and self-defense sufficiently instructed the jury that it should acquit defendant if it determined he acted in self-defense even if his shot struck someone he was not intending to shoot); *Springer v. State*, 335 Ga. App. 462,

court did not err, then, in providing the jury with a one-sentence instruction on the legal theory of transferred justification.[31]

5. Finally, Craw claims the trial court erred by providing confusing instructions on justification and mutual combat. Yet again, we disagree.

In its initial charge to the jury, the trial court instructed that a killing as a result of mutual combat may be justifiable in certain circumstances. And immediately thereafter, the court instructed the jury on justification and self-defense. Importantly, during these instructions, it further explained when mutual combat would not be compatible with a justification defense. Even so, Craw contends these instructions were contradictory and favored the State's argument that the shooting was not an act of self-defense. But as the trial court explained in its order denying the motion for new trial, Craw does not claim the instructions were erroneous as a matter of law.

463 (1) (781 SE2d 575) (2016) (same).

[31] Although not enumerated as error, Craw seems to argue the trial court should not have instructed the jury on transferred intent at all because that theory was not alleged in the indictment. But as previously explained, any challenge to the indictment in this regard has been waived. *See supra* note 15 & accompanying text. Furthermore, any implicit contention that a charge on transferred intent was not applicable to the facts of this case is without merit. *See Smith v. State*, 315 Ga. 357, 364 (4) (882 SE2d 289) (2022) (holding even slight evidence defendant intended to shoot a different person than the actual victim warranted a charge on transferred intent).

21

Moreover, Craw elides the fact that the trial court ultimately simplified the instructions on mutual combat and when such a course of conduct can be justified, charging the jury as follows:

> After consideration of all the evidence, before you are authorized to return a verdict of guilty of felony murder, you must determine whether there are mitigating circumstances that, if any, would cause the offense to be reduced to voluntary manslaughter.
>
> If you find from the evidence that there was between the Defendant and the other party a mutual combat, then you will consider the laws—you will consider the rules of law concerning mutual combat and apply them to the evidence. If you find from the evidence that there was not—or no mutual combat, then you would not consider this law.
>
> Mutual combat occurs when there's combat between two persons as a result of a sudden quarrel or certain circumstances as indicating purpose, willingness, and intent on part of both to engage mutually in a fight.

And after instructing the jury that a killing as a result of mutual combat ordinarily amounts to voluntary manslaughter, the trial court further charged:

> Under some circumstances, such killing may be murder or it may be justifiable. If you find that the killing was done with felonious intent to take the life of another and the killing was accomplished as a result

22

of mutual combat, such killing would be murder. The killing as a result of mutual combat may be justifiable, and you may find it to be so if it appears that the Defendant reasonably believed at the time of the killing that the force the Defendant used was necessary to prevent death or great bodily injury to the Defendant or a third person or prevent the commission of a forcible felony and if it appears that the other party was the aggressor.

If it appears that the other party was not the aggressor, but the Defendant was the aggressor, then in order for the killing to be justified, if such killing was the result of mutual combat, it must further appear that the Defendant withdrew from the encounter and effectively communicated to the other party the intent to do so, and the other party notwithstanding continued or threatened to continue the use of unlawful force.

If you believe from all the evidence in this case that there was no mutual intent to fight or mutual combat between the Defendant and the other party, then you may determine whether or not the other party used words, threats, menaces, or contemptuous gestures towards the Defendant, and if so, whether or not it was sufficient to cause the Defendant to reasonably believe that the force that the Defendant used, if any, was necessary to prevent death or great bodily injury to the Defendant or the third person, or to prevent the commission of a forcible felony. Such words, threats, menaces, or contemptuous gestures may or may not be sufficient to cause a reasonable belief on the part of the

Defendant. It being solely a question for you, the jury, to determine from a consideration of the evidence in this case.

Viewing the jury instructions given as a whole to "determine whether the jury was fully and fairly instructed on the law of the case,"[32] the trial court properly charged the jury on the principle of mutual combat and how a justification defense impacts that principle. Indeed, the trial court's instructions generally tracked the suggested pattern jury instructions on these issues.[33] And Craw points to no authority for the proposition that the pattern charges in this case were inadequate.[34] In fact, these charges were proper concepts of law; and given that Craw has offered no evidence the jury was either misled or confused, he has failed to show the trial court erred in providing them.[35]

---

[32] *Walker v. State*, 308 Ga. 33, 36 (2) (838 SE2d 792) (2020) (punctuation omitted); *accord Martin v. State*, 310 Ga. 658, 664 (3) (852 SE2d 834) (2020); *Parrish v. State*, 362 Ga. App. 392, 405 (2) (868 SE2d 270) (2022).

[33] *See* Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases §§ 2.10.43, 3.10.10 (4th ed., 2021).

[34] *See Williams v. State*, 304 Ga. 455, 459 (3) (818 SE2d 653) (2018); *accord Martin v. State*, 308 Ga. 479, 483 (2) (841 SE2d 667) (2020).

[35] *Morris v. State*, 308 Ga. 520, 529-30 (4) (842 SE2d 45) (2020) (finding that the charge given by the trial court was not error as it was an accurate statement of the law that was properly adjusted to the evidence and circumstances of the case, and

For all these reasons, we affirm Craw's convictions and the denial of his motion for new trial.

*Judgment affirmed. Rickman and Pipkin, JJ., concur.*

---

defendant offered no evidence that the jury was confused or misled by this instruction); *Williams*, 304 Ga. at 458-59 (3) (concluding that because trial court's charge was substantially identical to the suggested pattern jury instruction on good character evidence and defendant points to no authority for the proposition that the pattern charge is inadequate, trial court's charge was not plain error).